**FILED**

**AUG 2 4 2011**

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| MICHAEL D. SMITH, | \* | CIV. 10-4131 |
|  | \* |  |
| Plaintiff, | \* |  |
|  | \* |  |
| -vs- | \* | REPORT and RECOMMENDATION |
|  | \* |  |
| MICHAEL J. ASTRUE, Commissioner, | \* |  |
| Social Security Administration, | \* |  |
|  | \* |  |
| Defendant. | \* |  |
|  | \* |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff seeks judicial review of the Commissioner's final decision denying him payment of disability insurance benefits and supplemental security income under Title II (denied in its entirety) and Title XVI (awarded in part and denied in part) of the Social Security Act.[1] The Plaintiff has filed a Complaint and has requested the Court reverse the Commissioner's final decision denying the Plaintiff disability benefits and to enter an Order awarding benefits. Alternatively, the Plaintiff requests remand to the Social Security Administration for further proceedings. The matter is fully briefed and has been referred to the Magistrate Judge for a

---

[1] SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. *See e.g.* 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five step procedure under Title II and Title XVI).

In this case, the Plaintiff filed his application for both types of benefits. AR 164-67, 161-63. His coverage status for SSD benefits expired on December 31, 2005. AR 7, 99. In other words, in order to be entitled to Title II benefits, Plaintiff must prove he was disabled on or before that date. AR 191.

Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED and REMANDED.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A).

## ADMINISTRATIVE PROCEEDINGS

This is Smith's third disability application. He filed his first application in July 2000. AR 93. It was denied and he did not appeal. *Id.* In December, 2002, Smith filed his second application. That claim was denied at the initial and reconsideration levels. An administrative hearing was held in October, 2004. Evidence in the record indicates Smith was in a county jail at the time of the hearing and was required to obtain a furlough to attend. AR 230. On January 20, 2005, an Administrative Law Judge, the Honorable Robert Maxwell, denied Smith's claim. AR 108. Smith asserts that by the time the decision was rendered, he (Smith) was in prison and his attorney (Barb Dinsmore) had died so no appeal was filed. AR 230.[2] Smith was incarcerated until 2006. *Id.* He filed this, his third claim, after his release from prison in 2006.

In a computerized, undated form entitled "Disability Report-Adult" Plaintiff listed the illnesses, injuries and conditions that limit his abilities to work as "brain trauma, double vision, carpel tunnel lft hand/back." AR 180. When asked to describe how his illnesses, injuries or

---

[2]Because Plaintiff did not appeal the January, 2005 decision, Plaintiff's disability status has been conclusively adjudicated through January 20, 2005 (the date of ALJ's decision on Plaintiff's second claim, which became final when he did not appeal) (AR 93-108). *See* 20 C.F.R. §§ 404.957(c)(1); 416.1457(c)(1) (ALJ may decline to consider one or more issues if the doctrine of res judicata applies because the Social Security Administration has made a previous determination or decision about Claimant's rights on the same facts and on the same issue or issues, and this previous determination has become final by either administrative or judicial action).

conditions limit his ability to work, Plaintiff stated, [C]lient is unable to grip with his left hand. Client states he is unable to grab & lift with that hand. Client states he is in constant pain all the time. He is unable to stand or sit for long periods of time. Most of the pain in from the lower back area. Client states that he has double vision from the head injury from past work injury. Client had brain trauma also from the work injury. Client also has memory loss." AR 180.[3] Plaintiff further explained that he became unable to work on March 1, 2000. AR 180. In a form entitled "Function Report–Adult" he filed in connection with his application (AR 195-203) Plaintiff listed the following effects of his illnesses, injuries or conditions: "Supposed to lift only 5 pounds, not supposed to squat, bend, or kneel, standing and sitting and walking & switching between them for to help the back pain. Double vision all the time. Memory is short. Climbing stairs hurts legs, down is worse (because?) of vision. Carpel tunnel in left wrist. Concentration & understanding are not good & have to be (illegible) at times to finish something."

Plaintiff's current claim was denied initially on June 28, 2006, (AR 118-120), and on reconsideration on December 11, 2006. AR 126-128. He requested a hearing (AR 132) and one was held on April 23, 2008, in Sioux Falls, South Dakota, before Administrative Law Judge (ALJ) the Honorable Robert Maxwell. AR 18-51. On June 30, 2008, the ALJ issued an eleven page, single-spaced decision. AR 15-25. The ALJ awarded benefits for a closed period between July 14, 2006 and October 1, 2007, but otherwise denied Plaintiff's claim. Because the ALJ found Plaintiff's disability began after Plaintiff's date last insured for SSD/DIB purposes, Plaintiff was awarded SSI benefits only.

On August 4, 2008, Plaintiff's attorney sent a letter to the Appeals Council requesting review of the ALJ's decision. AR 10. The attorney submitted the following additional evidence for the Appeals Council to review: a report from Dr. Freeman regarding Plaintiff's 2006 eye surgery (AR 395); a CT scan regarding Plaintiff's 2007 L4-5 surgical fusion (AR 379-381); and evidence regarding a second surgical fusion procedure, completed in 2009, to correct the 2007 surgical

---

[3]It appears this awkward language results from the form being completed by a Social Security Administration worker via a "teleclaim with claimant" during the initial application process on April 16, 2006. AR 192, 194.

procedure that had not properly fused (AR 390-92).   The Appeals Council denied review of Plaintiff's claim on August 10, 2010.  AR 1-4.   The Appeals Council indicated it reviewed the additional evidence but it did not provide a basis for changing the ALJ's decision because the ALJ "decided your case through June 30, 2008. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before June 30, 2008." AR 2.  Plaintiff then timely filed his Complaint in the District Court on September 13, 2010. Doc. 1.

## FACTUAL BACKGROUND

### A.      Biographical Information

Plaintiff was born in 1967.  He was thirty-two on his alleged date of onset and forty on the date of the administrative hearing.  AR 32.  He graduated from high school, then went into the Army for two years.  AR 34.  He was honorably discharged.  *Id.*   He has no post-high school or vocational training.  *Id.*  He is divorced, and lives alone in an apartment.  AR 33.

### B.      Work Experience

Plaintiff's relevant work experience is as a truck driver, a laborer in a rendering plant, and a construction worker.  AR 38, 224.  His final construction job consisted of building pole barns.  He worked on a crew that traveled around South Dakota and Minnesota.  He was injured on the job while building a pole barn in March, 2000.  AR 41-42.  Plaintiff describes the incident as follows:

> Okay. I don't remember the accident, but they tell me, we were setting trusses. . . We were setting trusses and I was standing up on a 2x6 waiting for them to bring it up to me and somehow I got hooked, the truss got hooked on another board.  The foreman got it to break loose. It was swinging wildly, I guess.  I asked him why I didn't climb down, you know, or jump down.  They guy who was working with me said it looked like it was going to drive you into the ground, you know.  So I was running to get away from the truss.  It swung and caught me in the backside, sent me flying and I —they figure I went up about 16 feet and came down and landed on a rock on my head on the left side.

AR 41.  Plaintiff describes the injuries he received as a result of the incident as massive brain trauma, "messed up" eyes, left wrist, back and leg injuries.  *Id.*  He was unemployed from the date of the accident until September, 2007.  AR 42.  In September, 2007, Plaintiff responded to a "help

wanted" sign in the window of a Madison, South Dakota convenience store. *Id.* He works behind the counter approximately twenty-five hours per week. AR 43. He earns $6.40 per hour. He usually works from 5:30 a.m. until 10:00 or 11:00 a.m. He makes coffee and waits on people. AR 45. He is allowed to sit down. *Id.* He stocks the candy but not the pop and beer. AR 48. He is limited to twenty-five hours a week because in his words "that's all my body can do." AR 44. If he works seven hours in one day his "body hurts so bad and [his] brain is just going a hundred miles an hour." *Id.* The next day, the pain is more than usual. *Id.*

### C.    Medical Evidence

Plaintiff's disability status is res judicata until January 20, 2005. He asserts, however, that his current alleged disability stems from the work related injury which occurred in March, 2000. Although the medical records pertaining to Plaintiff's pre-2005 treatment for that injury are not contained in the administrative record, his treatment is summarized by Judge Maxwell's 2005 written decision and other information which is contained in the record.

### 1.   Pre January 2005 Medical History[4]

Plaintiff sustained a work related injury on March 2, 2000. AR 94. He fell approximately fourteen feet, hitting his head on a rock when he landed. *Id.* He sustained a closed head injury with cerebral contusions (AR 95) rib fractures, bilateral pleural effusions, and a left shoulder injury. AR 96. He also suffered nerve damage to his right eye which resulted in double vision. *Id.* After the accident he developed back pain, left leg pain, and numbness in his left arm. *Id.* He was hospitalized from March 2 through March 30, 2000. He spent the first week in the ICU, and was then transferred to the rehabilitation unit where he participated in occupational, physical and speech therapy. AR 96.

On March 14, 2001, Plaintiff underwent opthalmological surgery for diplopia (double vision). AR   395. One of his treating  doctors (Dr. Freeman) referred to the procedure (the Harada-Ito

---

[4]Unless a Social Security disability hearing is re-opened, *res judicata* principles apply. *Bladow v. Apfel*, 205 F.3d 356, 361 fn.7 (8th Cir. 2000). As such, the medical evidence from the initial proceeding cannot be re-evaluated, but can serve as a background to show "deteriorating mental or physical conditions occurring after the prior proceeding." *Id.*

procedure) as a "fairly significant, radical eye muscle surgery." *Id.*   In a letter dated September 10, 2009, Dr. Freeman explained:

> I am writing in support of my patient Michael Smith. Mr. Smith is a 42 year old man with a history of significant head trauma, coma, and bilateral superior oblique palsies. He sustained significant, traumatic double vision as a result of this head injury.
>
> Mr. Smith underwent a fairly significant, radical eye muscle surgery called Harada-Ito procedure on March 14, 2001. This helped his problem quite a bit, but he then developed residual right superior oblique weakness and right inferior oblique overaction, for which he underwent the secondary procedure of a right inferior oblique recession of 11.0 mm on May 31, 2006. This has helped him significantly, as he used to have almost constant double vision and was inhibited from looking into down gaze.
>
> Mr. Smith's last visit with us was on October 10, 2008, at which time he was found to be doing very well with a minimal right hyperphoria of 2 in. Primary and 3 in down gaze. He was fusing at most times and only had a significant right hypertropia on the right head tilt. He would be due to return to us for his annual visit this fall.
>
> Although it is difficult to make predictions about prognosis, given that his most recent surgery took place over three years ago and he has been doing very well, I think he will be quite functional, from a visual standpoint. He certainly experienced a significant problem and recovery period with improvement after the first surgery and significant improvement after the second. I also think he will do quite well in the future from an eye alignment standpoint.

*See* Freeman letter, AR 395.[5]  One day after Plaintiff's eye surgery, Plaintiff's neurologist (Dr. Brodsky) opined Plaintiff was at maximum medical improvement for worker's compensation purposes. AR 98. He imposed restrictions consistent with a functional capacity assessment which had been performed earlier, including restricted lifting, carrying and pulling. Dr. Brodsky also opined Plaintiff should avoid crawling, kneeling and working overhead. Dr. Brodsky observed mild left hyperflexia but Plaintiff's gait, coordination, speech, motor strength and sensation all seemed normal. Dr. Brodsky attributed the tightness Plaintiff felt on his left side to the spasticity which stemmed from Plaintiff's head injury.   AR 98.  Plaintiff continued to complain of left lower extremity pain, left hand and wrist pain, and back pain. Dr. Brodsky referred Plaintiff to MAPS (Medical Advanced Pain Specialists). AR 98-99. Plaintiff underwent multiple injections (lumbar

---

[5]This was one of the items of evidence submitted for consideration to the Appeals Council.

facet joint injection, lumbar epidural steriod injection, lumbar sypmathetic blocks and median branch blocks. He also underwent IDET (intradiscal electrothermal therapy), an outpatient surgical procedure, and a pain rehabilitation program. AR 99. He continued, however, to complain of chronic pain.

Plaintiff saw Dr. Monsein, a pain management specialist, in February, 2004. AR 99. Dr. Monsein recommended continuation of Gabitril[6], wean off narcotic pain medication, and he raised the possibility of anti-depressants. *Id.* In April, 2004, Plaintiff saw Sara Flynn, a psychiatrist, for depression. He reported Paxil[7] had not helped but Lexapro[8] (which had apparently been prescribed in 2003 by Dr. Stanley) had helped. Dr. Flynn assigned Plaintiff a GAF of 60[9] and recommended Plaintiff restart Lexapro. Dr. Flynn provided Plaintiff with a trial sample of Seroquel.[10] When Plaintiff returned to Dr. Flynn two months later (June, 2004) he reported his mood had improved

---

[6]Gabitril is an anti-epilepsy drug. It is indicated as adjunctive therapy in adults and children 12 years and older in the treatment of partial seizures. Www.rxlist.com.

[7]Paxil is a psychotropic drug indicated for the treatment of major depressive disorder. Www.rxlist.com.

[8]Lexapro is a selective serotonin reuptake inhibitor. It is indicated for the acute and maintenance treatment of major depressive disorder in adults and adolescents. Www.rxlist.com.

[9]
GAF stands for Global Assessment of Functioning. Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4th Ed. 1994) A GAF score of 60 indicates "**moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning** (e.g. few friends, conflicts with peers or co-workers)." A more specialized version of the GAF, developed by a division of the Department of Veteran's Affairs (MIRECC) specifically identifies the effect of the scores upon a patient's ability to work. A GAF score of 60 on the MIRECC scale indicates borderline functionality and someone who misses school/ work fairly frequently and is inconsistently able to attend to child care. *See* http://www.desertpacific.mirecc.va.gov/gaf/MIRECC-GAF-scale-6-07.pdf

[10]Seroquel is a pyschotropic agent belonging to the chemical class of dibenzothiazepine derivatives. It is indicated for the treatment of schizophrenia and for the acute treatment of manic and depressive episodes associated with bipolar disorder. It is also indicated for maintenance treatment of bipolar disorder. Www.rxlist.com.

since restarting Lexapro.  Dr. Flynn assigned a GAF of 68.[11]  Dr. Flynn recommended that Plaintiff take Lexapro regularly and Seroquel as needed.  AR 100.

Plaintiff was arrested for DUI and was in the Mike Durfee State Penitentiary (MDSP) from approximately December, 2004 until March, 2006.  He received his health care during that time from the prison doctors.

Plaintiff's medical condition and treatment  beginning in 2005  are examined in more detail because the first date for which Plaintiff's  claim for benefits is not barred by *res judicata* is January 20, 2005 and Plaintiff's date last insured for SSD/DIB benefits December 31, 2005.

### 2.    Mike Durfee State Prison (12/04-2/06)

Plaintiff reported the 2000 work-related injury during his prison intake healthcare assessment. AR 252.  He explained the injury caused him to be in a coma for two weeks and caused a lumbar spine injury in addition to torn muscles and injuries to his eyes.  *Id.*  Among his current medications he listed Seroquel, Lexapro, and hydrocodone.[12]

Plaintiff saw Dr. Schaeffer on December 20, 2004.  AR 248.   Examination revealed tenderness in the lumbosacral area and some symptoms of radiculopathy from the lumbar disks.  *Id.* Dr. Schaeffer decided to continue Plaintiff's medical regimen but did not renew the hydrocodone. "This decision will have to be made by the medical director."  *Id.*  Plaintiff returned to Dr. Schaeffer again on January 3, 2005, requesting that his hydrocodone prescription be reinstated.  AR 247.  Dr.

---

[11]A GAF score of 68 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  On the MIRREC scale a score of 68 remains in the borderline category, indicating someone who misses school/ work fairly frequently and is inconsistently able to attend to  child care.  *See* http://www.desertpacific.mirecc.va.gov/gaf/MIRECC-GAF-scale-6-07.pdf

[12]Hydrocodone is the generic name for Vicodin.  It is an opioid analgesic.  It is indicated for the relief of moderate to moderately severe pain.  Www.rxlist.com.

Schaeffer again deferred the decision to the medical director, but did allow a fourteen day prescription. *Id.*

In January, 2005, the physician's assistant (Zike) ordered an x-ray of Plaintiff's lumbar spine. It showed that the alignment of the vertebra was good and the disc spaces were well maintained. No fractures were identified. AR 256.

Plaintiff reported to the prison health service in February, 2005, requesting treatment for low back pain. AR 249. Dr. Schaeffer's physical exam revealed diminished ability and mild discomfort. He prescribed Naprosyn[13] and Darvocet.[14]   In February, 2005, Plaintiff was referred to Lewis & Clark Behavioral Health Services Yankton, South Dakota for evaluation for depression. AR 246. The evaluator switched Plaintiff's medication from Lexapro to Celexa[15], but continued with Seroquel.

Plaintiff returned to the prison doctor in April, 2005, complaining of back pain. AR 243. He reported the Darvocet helped with his pain but the Naprosyn was not helpful. Physical exam revealed tenderness to palpation over the L3 to S1 area and tenderness in the paralumbar muscles, mostly on the left. He also demonstrated tenderness on the left sciatic nerve. Straight leg raises were negative bilaterally. His reflexes and muscle strength were normal. *Id.* Dr. Wallinga discontinued Naprosyn and started Lodine.[16]

---

[13]Naprosyn is a non-steroidal anti-inflammatory.  It is indicated for pain management. Www.rxlist.com.

[14]Darvocet is a combination of propoxyphene and acetaminophen.  It is indicated for the relief of mild to moderate pain.

[15]Celexa is a selective serotonin reuptake inhibitor.  It is indicated for the treatment of depression.  Www.rxlist.com.

[16]Lodine is a non-steroidal anti-inflammatory.  It is indicated for acute and long-term use in the management of osteoarthritis and acute pain.  Www.rxlist.com.

Plaintiff returned to the Lewis & Clark Behavioral Health Services Clinic in April, 2005 for follow up. AR 242. He reported doing "marginally o.k." but still feeling depressed. He also reported difficulty sleeping. *Id.* He admitted his Seroquel was discontinued because he was caught "cheeking" it because it was administered in the afternoon rather than in the evening. *Id.* Dr. Steil's impression was depressive disorder, NOS and history of major head trauma. He continued Plaintiff's Celexa and added Bupropion.[17]

Plaintiff returned to MDSP health services in May, 2005. He requested renewal of his Lodine and Darvocet. AR 241. The physician's assistant indicated he would request Plaintiff's MRI from the Orthopedic Institute. The physical exam revealed decreased range of motion throughout the lower back. Forward flexion and extension and lateral bending caused pain. Straight leg raises were negative. *Id.* The PA renewed Plaintiff's medications and ordered a Medrol Dosepak for inflammation. In June, 2005, the physician's assistant refused Plaintiff's request to extend the Darvocet order for a longer than one month interval. AR 240. She indicated her goal to wean Plaintiff off Darvocet in favor of extra strength Tylenol. *Id.*

Later in June Plaintiff returned to MDSP health services requesting to be placed back on Darvocet. AR 239. The physician's assistant noted the MRI did show a protruding disc, but no severe stenosis. *Id.* She noted mild foraminal stenosis and disk degeneration. Plaintiff insisted he would be having surgery upon his release, but the physician's assistant disagreed. *Id.* Given Plaintiff's history of drug and alcohol abuse, she refused to renew the Darvocet but agreed to continue Plaintiff on Lodine and extra-strength Tylenol.

In July, 2005, Plaintiff saw the prison doctor (Herbert Saloum). AR 238. Dr. Saloum's note says "he can give me a long story of an injury to his back falling off a ladder." *Id.* Dr. Saloum noted Plaintiff's history of pain injections which apparently were not effective. Dr. Saloum also noted Plaintiff's pre-incarceration history of hydrocodone "which is the first thing he asked for." Saloum

---

[17]Bupropion is the generic name for Wellbutrin. It is an antidepressant, indicated for the treatment of major depressive disorder. Www.rxlist.com.

observed Plaintiff did not appear to be in distress upon walking into the exam room but was "theatrical" in his pain demonstration upon examination. Dr. Saloum's physical examination was normal, except Plaintiff's reflexes were decreased " a little bit" on the left. Dr. Saloum continued Plaintiff's Darvocet, and prescribed Motrin[18] and extra strength Tylenol. *Id.*

Plaintiff saw Dr. Schaeffer at MDSP health services in August, 2005. Dr. Schaeffer noted "this patient . . has a problem with chronic low back pain and is a drug seeker. He asked me for Seroquel for sleep, which I refused to give him. He also would like something stronger for his pain, but I told him he could not have anything stronger. He does not appear to be in any pain and ambulates quite well. What I have been using is Darvocet-N 100 twice a day, Motrin 600 noon and at h.s and he can also take Tylenol Extra Strength twice a day with the Motrin. I think this is very adequate for him, and this is all he needs." AR 235.

Plaintiff returned to Lewis & Clark in August, 2005. He reported that he discontinued Wellbutrin in July. He had been feeling better so he discontinued it. However, his mood was again depressed. AR 237. He rated his mood as a 4/10. He complained of "terrible" sleep. He requested Seroquel for sleep, and asked the outside doctor to instruct the penitentiary personnel to administer it at 9:00 p.m. instead of 3:00 in the afternoon. The nurse told Plaintiff they were unable to do that. *Id.* She explained the importance of continuity in his medications; Plaintiff agreed to stay on Bupropion and it was restarted. *Id.* When Plaintiff returned to Lewis & Clark in December, 2005, his reported stable mood and better sleep. AR 236. He denied new or worsening symptoms. His medications were continued. *Id.*

Dr. Wallinga (MDSP health services) saw Plaintiff in February, 2006 for low back pain. AR 234. Dr. Wallinga  noted Plaintiff's plan to see a specialist upon release from prison. Dr. Wallinga's physical exam revealed tenderness with palpation over the lumbar spine but no tenderness of the paraspinal muscles. Dr. Wallinga continued Plaintiff's previous medications. *Id.*

---

[18]Motrin is the brand name for Ibuprofen.  It is indicated for the relief of the signs and symptoms of osteoarthritis and mild to moderate pain.  Www.rxlist.com.

### 3.     Minneapolis Clinic of Neurology, LTD. (Dr. Brodsky) 4/06-8/09

Plaintiff saw Dr. Brodsky in March, 2006. Dr. Brodsky noted he'd not seen Plaintiff since 2003, but at that time Plaintiff complained of "ongoing severe back pain and problems with left carpal tunnel syndrome." AR 258. Dr. Brodsky noted Plaintiff had been in prison and had just been released a few weeks ago at the time of the April, 2006 visit. Dr. Brodsky also noted Plaintiff would be seeing a Sioux Falls surgeon for further treatment and possible surgery. *Id.* Dr. Brodsky noted some diplopia and some skew deviation of Plaintiff's eyes. *Id.* Dr. Brodsky released Plaintiff from care other than annual visits.

Dr. Brodsky referred Plaintiff to psychologist Steve Morgan for a neuropsychological evaluation on May 15, 2008. AR 375. Mr. Morgan noted that although Plaintiff was then working part-time, he and his parents still perceived problems with cognition and Plaintiff was applying for disability. He reported impaired memory since his head injury in 2000. AR 375. Morgan indicated the testing should provide an accurate estimate of Plaintiff's capabilities. AR 376. Morgan reported "considerable neuropsychological recovery" since the initial evaluation in 2001. Plaintiff's test results had "largely normalized" with only subtle residual impairment remaining. *Id.* Morgan concluded "it would appear at this time that adaptive limitations are going to be more directly timed to physical limitations (i.e. related to his back) and possible personality/behavioral changes associated with frontal lobe injury." AR 377.

Dr. Brodsky wrote a "to whom it may concern" letter on August 31, 2009. AR 394. He explained Plaintiff had been making "slow but steady" recovery since his injury in 2000. Dr. Brodsky indicated Plaintiff was ready to proceed with further education, but had difficulty for "several years" because of his head injury. *Id.*

### 4.     Orthopedic Institute (Dr. Benson) 4/25/06

Dr. Benson saw the Plaintiff on April 25, 2006. Plaintiff complained of knee pain and low back pain. AR 261. Dr. Benson noted Plaintiff's 2003 discography study which was completed at the Mayo Clinic which showed "disc tearing at 3-4, 4-5, and 5-1." Dr. Benson also acknowledged

Plaintiff's "persistent" low back pain. Plaintiff's physical exam, however, was relatively normal. AR 261. Dr. Benson reviewed Plaintiff's previous MRI. He concluded "due to his three level disc disease and the fact that artificial disc are not approved for that kind of pathology yet, I would advise he continue to manage with his discomfort conservatively with re-eval on a yearly or biannual bases." *Id.*

### 5.   VanDemark Orthopedic Specialists 4/27/06 -6/07/06

Plaintiff reported to Dr. Vandemark on April 27, 2006. AR 315. He complained of more pain and numbness in his left hand. He indicated the pain and numbness woke him up at night. Dr. VanDemark noted a normal affect, mood and gait. Plaintiff's left hand was positive for Tinel's and Phalen's signs, and had a positive median nerve compression test. Strength and tone were intact, but Plaintiff did have weakness with thenar musculature. Plaintiff's right hand was normal. *Id.* Dr. VanDemark injected Plaintiff's left hand with Lidocaine and Depo-Medrol and instructed Plaintiff to return p.r.n. *Id.*

When Plaintiff returned to Dr. VanDemark on May 25, 2006, he reported the cortisone shot helped his left hand pain "immensely." AR 314. Dr. VanDemark told Plaintiff he planned on 'releasing his left carpal tunnel in the near future." *Id.* Dr. VanDemark also referred Plaintiff to Dr. Alvine for further care of Plaintiff's low back pain. Dr. VanDemark's June 7, 2006, note, however, indicates the carpal tunnel surgery was postponed until Plaintiff could get work comp clearance to pay for the procedure. AR 313. Plaintiff was instructed to contact the doctor's office when he wished to proceed. *Id.*

### 6.   Orthopaedic Consultants and Alvine Foot & Ankle Center 6/26/06-6/23/09

Plaintiff presented to Dr. Greg Alvine on June 26, 2006. AR 319. Plaintiff reported worsening back pain since his work-related injury in 2000. AR 319. He reported no formal treatment or therapy since 2003, and a limited ability to function. *Id.* He reported his left leg felt tight from the knee down and the sensation in his left leg felt different from the right. Lifting and standing made the pain worse. Dr. Alvine noted good strength in Plaintiff's legs and normal

13

sensation. Straight leg raise was normal. Dr. Alvine ordered a repeat MRI and instructed Plaintiff to return following the test. *Id.*

Plaintiff returned to Dr. Alvine on August 7, 2006. AR 318. The MRI dated July 14, 2006 showed multi-level degenerative disc disease and a disc bulging slightly to the left and central to the L4-5 level with some moderate foraminal stenosis on the left side. *Id.* Dr. Alvine's impression was low back pain with leg pain, probably from the L4-5 motion segment and associated foraminal stenosis. He recommended a discogram at L3-4, L4-5 and L5-S1 before making a definitive treatment plan. In the meantime, Dr. Alvine imposed a five pound lifting restriction, avoiding bending and twisting. AR 318. When Plaintiff returned to Dr. Alvine in August, 2006, the discogram had been completed. AR 317. The discogram revealed a 4 out of 10 concordant pain response at L3-4 with 70% similar to his back pain, and 8 out of 10 concordant pain response at L4-5 with 90% similar to his back pain. From this Dr. Alvine concluded the L4-5 level was probably Plaintiff's pain generator. AR 317. He wished to exhaust all conservative measures before surgery, so he ordered EMG and nerve conduction studies. *Id.* Dr. Alvine referred Plaintiff to Dr. Stone for a conditioning program. *Id.*

Plaintiff returned to Dr. Alvine on January 19, 2007. AR 359. Dr. Alvine noted Plaintiff had been "working with Dr. Stone and they have exhausted all conservative measures." *Id.* Plaintiff reported ongoing knee problems. Dr. Stone did an MRI of the left knee, which Dr. Alvine interpreted to show patellofemoral athrosis and inflammation along the medial femoral condyle consistent with a bursal type inflammation. AR 359. Dr. Alvine decided that a fusion at the L4-5 level was indicated, because Plaintiff had exhausted all conservative measures. He wished to perform a relatively new procedure and asked Dr. Bryan Wellman to assist. *Id.*

Plaintiff was admitted to Sanford USD Medical Center on April 25, 2007. AR 360. Dr. Alvine and Dr. Wellman performed a left L4-5 microdiskectomy, transforaminal interbody fusion left L4-5 and posterior stabilization with sextant screws, left L4-5. *Id.* Plaintiff began physical therapy in the hospital on April 26, 2007 and was discharged the next day. *Id.*

14

Plaintiff saw Dr. Alvine in the office two weeks later for follow up. AR 369. Plaintiff reported doing "well." *Id.* Dr. Alvine instructed Plaintiff to walk for exercise, but to avoid bending, twisting, and lifting. Dr. Alvine instructed Plaintiff to return in one month. *Id.* When Plaintiff returned on June 11, 2007, he again reported doing "well." AR 370. He back was still a little sore and his left leg was still a little tight around the knee, but he was feeling better. Dr. Alvine noted good strength, normal sensation and negative straight leg raising tests. *Id.* Dr. Alvine continued Plaintiff's bending and twisting restrictions, and instructed Plaintiff to refrain from lifting more than 10-15 pounds. He instructed Plaintiff to return in six weeks. *Id.*

Plaintiff again reported doing "well" three months post-surgery on July 30, 2007. AR 371. His strength, sensation and straight leg raising tests were again normal. Dr. Alvine ordered AP and flexion-extension x-rays, which appeared to show a solid fusion and no hardware failure or loosening. *Id.* Dr. Alvine recommended a therapy program to work on trunk stabilization and abdominal muscle strengthening "to get him ready for the workforce." *Id.* Dr. Alvine released Plaintiff to work three, four hour shifts per week on light duty status. *Id.* Dr. Alvine instructed Plaintiff to return in two months. *Id.*

In October, 2007, Plaintiff reported he was doing "reasonably well." AR 372. His left leg had not come around as he hoped it would and he still had "manageable" back pain. *Id.* X-rays continued to show what appeared to be a solid fusion and no loosening of the hardware. Dr. Alvine continued the three hour per day work restriction. Dr. Alvine also ordered a cushioned mat to ease Plaintiff's discomfort when standing. *Id.* Dr. Alvine released Plaintiff to p.r.n. care and instructed him to return one year post surgery, sooner if any problems occurred. *Id.*

Plaintiff returned to Dr. Alvine in April, 2008, one year post surgery. AR 374. Dr. Alvine noted Plaintiff was doing "reasonably well" but still had occasional back pain. "He has just been struggling." *Id.* Plaintiff indicated pain in the left lower back area and continuing discomfort in the left leg. *Id.* Dr. Alvine's exam revealed good strength, normal sensation, full range of motion and negative straight leg raise. X-rays again showed what appeared to be a solid fusion with no hardware

failure or loosening. *Id.* Dr. Alvine concurred the time was appropriate for a formal functional capacity analysis. *Id.*

The next note from Dr. Alvine's office is dated January 15, 2009. AR 382. Plaintiff reported "more and more back pain." *Id.* Plaintiff pointed to the L4-5 level of his back as the source of his pain. *Id.* Dr. Alvine's physical exam revealed pain on extension but normal strength. X-rays again showed no hardware failure or loosening. Dr. Alvine noted, however "there is a graft in the disc space. It is hard to tell if it is completely solid." *Id.* Dr. Alvine decided to order a CT scan to see whether Plaintiff had a solid arthrodesis. The CT scan was performed on January 30, 2009. AR 380. The radiologist's report indicates "the interbody portion has not completely fused at this time." AR 381. Plaintiff returned to Dr. Alvine in March, 2009. AR 379. Dr. Alvine noted Plaintiff had a new compression fracture at L1, and psuedoarthrosis at L4-5. Dr. Alvine noted "at this point, I think that if he is continuing to have back pain and will still have to get a fusion at L4-5, it is not unreasonable to re-fuse this." AR 379. Dr. Alvine ordered a repeat MRI. *Id.*

Dr. Alvine repeated the L4-5 fusion surgery on June 23, 2009. AR 391. Upon inspection of the hardware, Dr. Alvine could see "he had gross motion at the L4-L5 level." *Id.* Dr. Alvine removed the hardware from the first surgical procedure and placed new screws and rods on both sides of the L4-5 level of Plaintiff's spine. *Id.* Two weeks after the repeat fusion procedure, Plaintiff reported doing "well." AR 393. X-rays revealed acceptable healing and alignment, with no evidence of hardware failure or loosening. *Id.* Dr. Alvine instructed Plaintiff to walk for exercise, and wear his corset. He noted plans to fit Plaintiff with a bone stimulator. Plaintiff was instructed to return for follow-up in a month. *Id.*

### 7.   Avera Rehabilitation Associates, Dr. Joshua Stone 9/18/06-9/19/06

Plaintiff reported to Dr. Jonathan Stone at the Avera Rehabilitation program on September 18, 2006. AR 327. Plaintiff reported trouble sleeping, loss of hearing in his left ear and double vision. AR 328. He reported pain in his left arm, back, leg and hands. Dr. Stone noted a slight decrease in strength in Plaintiff's left leg and slight limitation in lumbar range of motion. His lower extremity strength, however was normal with no muscle atrophy noted. *Id.* Dr. Stone recommended

16

physical therapy for core strengthening and instructed Plaintiff to return in three to four weeks. AR 329.

The physical therapist (Greg Fendrich) saw Plaintiff the next day. AR 324. The therapist's notes indicate Plaintiff was referred for therapy three times a week for four weeks. *Id.* Plaintiff reported significant pain with all prolonged periods of sitting, standing and walking. He reported constant pain at 5/10 with up to 8/10. The physician's assistant explained the emphasis of physical therapy would be stabilization strengthening, supportive modalities and soft tissue mobilization. AR 325. There are no further physical therapy notes in the record from 2006.

Plaintiff participated in physical therapy after his first low back surgery. He participated in eighteen therapy sessions at Avera McKennan from August 6, 2007, through September 28, 2007. AR 350. At the end of the physical therapy program Plaintiff was working twenty hours per week, and reported pain in the center of his low back. His therapy goals were only partly achieved due to low back pain, but he had a full range of motion and full strength. *Id.*

### 8. University Psychiatry Associates Avera Health 5/22/06

Plaintiff reported to University Psychiatry Associates on May 22, 2006. AR 336. Plaintiff saw Karl Oehlke, the provider who originally prescribed Lexapro and Seroquel in 2003 before Plaintiff was incarcerated. Plaintiff reported the Wellbutrin[19] the prison doctors prescribed was not as helpful as Lexapro and Seroquel but it at least "took the edge off." AR 336. Plaintiff explained he was depressed and "on the verge of crying" and wished to reinstate Lexapro. AR 337. Oehlke assigned Plaintiff a GAF of 65. He instructed Plaintiff to taper off the Wellbutrin, restart Lexapro, start Seroquel, and follow up in one month. *Id.*

### 9. Non-Treating/Non-Examining Physicians Functional Capacity Assessment (Dr. Frederick Entwistle & Dr. Kevin Whittle) 5/26/06 & 12/08/06

Dr. Frederick Entwistle reviewed Plaintiff's prison medical records, and the Orthopedic Institute records from April, 2006. Dr. Entwistle opined Plaintiff could lift 20 pounds occasionally

---

[19]Wellbutrin is the brand name for Bupropion.

and 10 pounds frequently, could stand/walk 6 hours out of an 8 hour day, and could sit 6 hours out of an 8 hour day. AR 267. Dr. Entwistle indicated Plaintiff could climb stairs, ladders and ropes only occasionally and that Plaintiff's fine manipulation was limited. He also advised Plaintiff should avoid exposure to hazards such as heights and machinery because of his pain medication, but otherwise did not impose any significant restrictions. AR 266-73.

On October 12, 2006, non-examining, non-treating physician Dr. Kevin Whittle submitted a "Case Analysis" which consisted of one sentence: "I have reviewed all the evidence in the file, and the assessments of 5/26/2006 for DLI of 12/2005 and current are affirmed as written."

**10.    Non-Treating/Non-Examining Physician Psychiatric Review Techniques (Dr. Jerry Buchowski, Dr. Doug Soule) 6/27/06 & 10/12/06**

Dr. Jerry Buchowski completed a PRTF on June 27, 2006. He opined Plaintiff had an affective disorder (depression, NOS) but that it was not severe. AR 284-96. Dr. Buchowski noted "insufficient evidence" of three out of the four "B" criteria, and no episodes of decompensation. AR 294. He found the evidence did not establish the presence of the "C" criteria. AR 295. Dr. Buchowski noted that during the relevant time frame (January 21, 2005 through December 31, 2005) Plaintiff was incarcerated and was stable on his medication. AR 296.

Dr. Buchowski completed another PRTF for the time frame between March 1, 2006 and June 27, 2006. AR 298.    For that time frame, Dr. Buchowski's findings were essentially the same, except as to the "B" criteria, Dr. Buchowski found no restriction of activities of daily living, maintaining social functioning, or maintaining concentration, persistence or pace, and no episodes of decompensation. AR 308. He again found no evidence of the presence of the "C" criteria. AR 309.

On October 12, 2006, non-examining, non-treating physician Dr. Doug Soule offered the following opinion at the request of the state agency: " This is a reconsideration case, it involves DLI and current. For the DLI, I have reviewed all the evidence in the file, and the assessment of 6-27-06 is affirmed as written. In addition, for the current evaluation, I have reviewed all the evidence in the file, and the assessment of 6-27-06 is affirmed as written. Thanks, Doug." AR 334.

D.     **Hearing Testimony**

Plaintiff's administrative hearing was held on April 23, 2008.  AR 30.  Plaintiff and his mother, Sandy Smith testified.  Plaintiff was represented by counsel at the hearing.  A vocational expert (VE), William Tucker, also testified.

The ALJ explained at the beginning of the hearing that Plaintiff's previous claim for benefits was denied on January 20, 2005, and that his date last insured was December 31, 2005.  AR 31.  The ALJ also noted that Plaintiff's claim for SSI benefits was not dependent upon his date last insured.  AR 32.

Plaintiff was born in 1967 and was forty years old on the date of the administrative hearing.  *Id.*  He is divorced and lives alone on the eleventh floor of a twelve floor apartment building.  AR 33.  He rides the elevator up, but tries to walk the stairs down.  AR 34.

Plaintiff graduated from high school.  *Id.*  He served two years in the Army and received an honorable discharge.  *Id.*  He has no post-high school education.  *Id.*  He has worked as a truck driver for a rendering plant, an equipment operator for a rendering plant, and a construction worker.  AR 35-38.  He does not believe he is physically capable of performing any of those jobs.  *Id.*

Plaintiff sustained a work-related injury in March, 2000 when he was working with a crew building a pole barn.  He standing on a 2 x 6 waiting for a truss to be lifted up to him when the truss knocked him off and sent him flying 16 feet into the air.  AR 41-42.  He landed on the ground and his head hit a rock.  *Id.*  He sustained "massive brain trauma" and injuries to his eyes, left wrist, back and left leg.  *Id.*  Plaintiff was unemployed from the date of the accident until September, 2007. AR 42.  In September, 2007 Plaintiff's doctor told him he could get back to work, so he inquired about a help wanted sign he saw at a convenience store in Madison, South Dakota.  He works about twenty-five hours per week and earns $6.40 per hour.  AR 43.  He typically works from 5:30 -10:00 or 11:00 a.m.  He only works twenty-five hours because "that's all [his] body can do."  AR 44.  If he works more than that his "body hurts so bad and [his] brain is just going a hundred miles an hour [he] just wants to sit and stop hurting."  AR 44.  There is a stool and a table available for Plaintiff

to alternate sitting and standing. AR 45-46. Plaintiff estimated he can stand in one spot for only about ten minutes before he needs to move around. AR 46. He estimated he can sit for about twenty minutes before he needs to get up and move around. *Id.*

Dr. Brodsky in Minneapolis is Plaintiff's primary treating neurosurgeon. AR 49. Dr. Brodsky has not imposed any particular limitations on him as far as his mental capacity; he's told him "if you want to try it, try it." *Id.* He has noticed that some of his past memories are "just gone" and some new things stick while some of it will be gone forever. AR 49-50. He also notices that when his physical pain gets worse he does not process things as well mentally. AR 50.

Dr. Richard Freeman from Minneapolis is the physician who treated Plaintiff's eye injuries. AR 50. Plaintiff has had a couple of surgical procedures to repair the muscles that align the eyes properly. AR 51. Plaintiff has had double vision since his 2000 injury. Despite his surgical procedures, Plaintiff testified he still has double vision and it is "as good as it's ever going to get." AR 52. Plaintiff explained he has learned to adapt to his vision and the second surgery improved his condition, but he still has to hold his head and body a certain way to make things line up. AR 53.

Plaintiff's back injury as a result of the 2000 accident finally culminated in a surgical fusion by Dr. Alvine in April, 2007. AR 54. Plaintiff described his back problem as "constant pain." AR 55. He said his back gives him "the most problem physically." He described his back pain as a 2 out of 10 first thing in the morning, but an 8 out of 10 after a five hour work day. AR 56-57. He takes Darvocet to manage his pain and Seroquel for sleep. AR 57-58. He does not currently treat for depression. AR 70.

Plaintiff continues to have a numbness or tightness in his left leg. AR 60. The cause of that problem has never really been determined. *Id.* He fell on his left side, which triggered problems with his left wrist. AR 62. Dr. VanDemark did a left carpal tunnel surgery which helped "tremendously." *Id.* He continues to have trouble with fine dexterity tasks such as putting on a bolt. AR 63. The trouble is caused both by his hand and by his vision problems. AR 64.

Plaintiff does his own cooking, but his mother does his laundry for him. AR 65. He lives in an apartment so there is no lawn work or snow removal. AR 66. He is able to care for his personal needs and does his own grocery shopping. AR 67. He has a current driver's license. AR 70. His parents help him pay the bills and he receives food stamps. AR 78-79.

Plaintiff's mother (Sandy Smith) testified at the administrative hearing. AR 79. She sees the Plaintiff two or three times a week. AR 80. She observed that Plaintiff's convenience store job has been good for him, but he gets irritable and frustrated easily when he is tired. AR 81-82. She and her husband assist him with his finances. AR 84.

William Tucker testified as a vocational expert (VE) in Plaintiff's case. AR 85. Tucker explained that Plaintiff's work as a convenience store cashier does not qualify as past relevant work because it occurred after Plaintiff's alleged onset date, and because the wages Plaintiff has earned at the convenience store have never amounted to substantial, gainful employment. AR 86.

The ALJ posed two hypothetical questions to the VE. The first hypothetical asked the VE to assume an individual with Plaintiff's age, education, and work experience, and medical impairments as described by Plaintiff during the hearing. AR 86. The VE opined such an individual would be precluded from Plaintiff's past relevant work and any other work the VE could identify. *Id.* Plaintiff's expressed need to switch positions frequently and his inability to work more than twenty-five hours per week preclude him from performing any kind of full-time work. AR 87.

The ALJ's second hypothetical asked the VE to assume an individual with Plaintiff's age, education, and work experience, along with the physical restrictions imposed by Dr. Entwistle's FCE (occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk/sit six hours out of an eight hour day with normal breaks, unlimited push/pull, postural activities are all limited to frequent, except climbing of ramps ladders or scaffolds which may be done only occasionally. The ALJ indicated Plaintiff's fingering was limited to frequent or occasional and imposed a limitation to avoid exposure to environmental hazards. AR 87-88. The VE opined such a person would be unable to perform any of Plaintiff's past relevant work, but would be able to perform Plaintiff's

current job as a cashier, and could perform other work at the light level, such as assembler of small products or inspector and hand packager. AR 88. If Plaintiff's testimony was credible, however, he would not be able to perform any of those jobs. *Id.*

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

**B.     The Disability Determination and The Five Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:**     Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

When the issue is whether the Claimant's condition has improved to a degree that a disability has ceased, the sequential analysis is applied with a few extra steps added. *Delph v. Astrue* 538 F.3d 940, 945-46 (8th Cir. 2008). The "issue is whether the claimant's medical impairments have improved to the point where he is able to perform substantial gainful activity." *Id.* at 945.

This medical improvement standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. The continuing disability review process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f). *See Dixon v. Barnhart*, 324 F.3d 997, 1000-1001 (8th Cir. 2003). The regulations provide that determining whether a claimant's disability has ceased may involve up to eight steps in which th Commissioner must determine the following:

(1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Delph v. Astrue*, 538 F.3d 945-46 (citing 20 C.F.R. § 404.1594(f)).

24

C.    **Burden of Proof**

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

D.    **The ALJ's Decision**

The ALJ issued an eleven page, single-spaced decision on June 30, 2008. The ALJ's decision discussed steps one through five of the above five-step procedure outlined by 20 C.F.R. § 404.1520. For the period after September 30, 2007, the ALJ also discussed the additional steps outlined by 20 C.F.R. § 404.1594 regarding medical improvement.

At Step One, the ALJ found Plaintiff has not engaged in substantial gainful employment since January 21, 2005. AR 19.

At Step Two, the ALJ determined Plaintiff has the following severe impairments: low back pain and left carpal tunnel syndrome. AR 19.  He found the following impairments to be not severe: left knee problem, double vision, and depression.  AR 19-20.

At Step Three, the ALJ determined Plaintiff did  not, at any relevant time,  have an impairment of combination of impairments that meet or equal a  "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d), 404.1525 and 404.1526.  AR 20-21.

At Step Four, the ALJ assigned residual functional capacity for Plaintiff for three separate time frames: (1) January 22, 2005 - July 13, 2006; (2) July 14, 2006- September 30, 2007; and (3) October 1, 2007 forward.

For the first time frame (January, 2005 through July, 2006) the ALJ adopted the RFC as formulated by the non-examining, non-treating state agency physician, Dr. Entwistle. That RFC limited Plaintiff to light duty work, with only occasional climbing of ladders, ropes or scaffolds and limited fingering on a repetitive basis with the left hand, along with a restriction on working around hazards due to Plaintiff's medication. AR 20. The ALJ found Plaintiff's testimony regarding his physical limitations was not credible for the January 2005 through July 2006 time frame.

For the July 2006 through September, 2007 time frame, the ALJ found Plaintiff had the residual functional capacity to perform sedentary work as defined by 20 C.F.R. § 404.1567(a) except he could not perform on a regular and sustained basis due to his worsening pain with commensurate limitation on his ability to sit for more than limited periods of time as the day wore on. AR 21. For this time period, the ALJ rejected the state agency physician's RFC and accepted the Plaintiff's testimony regarding his limitations as credible. *Id.*

For the third time frame (October 1, 2007 forward) ALJ found medical improvement occurred and Plaintiff's disability ended as of October 1, 2007. AR 23. The ALJ determined that beginning on October 1, 2007, the Plaintiff's RFC returned to what it was in January, 2005 ( the RFC as formulated by the non-examining, non-treating state agency physician, Dr. Entwistle). This RFC limited Plaintiff to light duty work, with only occasional climbing of ladders, ropes or scaffolds and limited fingering on a repetitive basis with the left hand, along with a restriction on working around hazards due to Plaintiff's medication. AR 23. The ALJ found Plaintiff's testimony regarding his physical limitations was not credible for the October 1, 2007 forward time frame.

At Step Five, the ALJ determined with the exception of the July 2006 through September 2007 time frame, Plaintiff is capable of a light duty work as described above. He determined Plaintiff remains capable of such occupations as: small products assembler and inspector hand packager AR 24. As such the ALJ determined Plaintiff is not "disabled" as that term is defined by the Social Security Act. AR 25.

### E.      The Parties' Positions

Plaintiff asserts the ALJ erred by finding him not disabled within the meaning of the Social Security Act.  He asserts the ALJ erred in three ways: (1) by failing to find Plaintiff disabled before July 14, 2006; (2) by finding Plaintiff was no longer disabled on and after October 1, 2007 and (3) by failing to make specific and express credibility findings prior to formulating Plaintiff's RFC.  The Commissioner asserts substantial evidence supports the ALJ's determination that Plaintiff is not disabled, and the decision should be affirmed.

### F.      Analysis

Plaintiff asserts the ALJ erred in three ways:   (1)by failing to find Plaintiff disabled before July 14, 2006; (2) by finding Plaintiff was no longer disabled on and after October 1, 2007 and (3) by failing to make specific and express credibility findings prior to formulating Plaintiff's RFC. These alleged errors are discussed in turn below:

#### 1.      Whether ALJ's finding that Plaintiff was not disabled before before July 14, 2006 is supported by substantial evidence

Plaintiff asserts the ALJ's finding that he was not disabled before July 16, 2006 is not supported by substantial evidence.  The Plaintiff asserts the ALJ erred by failing to consider medical evidence which pre-dated the most recent Social Security denial (January 2005) , by failing to consult with Plaintiff's treating physicians, and by drawing his own inferences from the medical records.

The ALJ supported his finding that Plaintiff did not become disabled until July 14, 2006 by stating "it was not until July 14, 2006, when first seen by Dr. Greg Alvine, an orthopedist, that degenerative disc disease of the Claimant's lower lumbar spine was documented by MRI results, most pronounced at the L4-5 level . . ."  Plaintiff asserts the ALJ wrongly "established January 21, 2005 as the starting point for consideration of the evidence, excluding longitudinal evidence from consideration." *See* Plaintiff's Brief at p. 27.  That, however, is not exactly what the ALJ did.  The ALJ established January 21, 2005 as the starting point because the Plaintiff's failure to appeal the previous denial rendered the claim for benefits *res judicata* for any time preceding  the date of Commissioner's final decision on the prior application for both SSI and SSD benefits. AR 15, 30-31. Because this is a new proceeding,  therefore, the earlier medical evidence cannot be re-evaluated but

can only serve as a background for new and additional evidence of deteriorating mental or physical conditions occurring after the earlier proceeding. *Bladow v. Apfel*, 205 F.3d 356, 361, fn. 7 (8th Cir. 2000).

The ALJ reviewed Dr. Benson's record dated April 25, 2006 (AR 261) which noted Plaintiff's "persistent" back pain but noted that Dr. Benson nevertheless recommended only conservative treatment. The ALJ noted Dr. Alvine's July 16, 2006 visit which documented the recent MRI results. Rather than request Dr. Alvine's opinion about the time when Plaintiff's disc disease became disabling, the ALJ deemed the July 2006 MRI as determinative of the severity of Plaintiff's degenerative disc disease and ultimately his disability status. AR 20. The ALJ concluded "thus, it appears the claimant's back problems were not so pronounced until seen by Dr. Alvine on July 14, 2006."

To reach this determination, the ALJ (1) disregarded the guidelines mandated by 20 C.F.R. § 404.1527(d) which require deference to treating and examining physicians and (2) substituted his own opinion for those of Plaintiff's treating and examining opinions. An ALJ's substitution of his own conclusions for the diagnosis of an examining physician constitutes reversible error. *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992). If the ALJ believed further information was necessary in light of the medical evidence in the record, the proper course would have been to order further consultative examination, not substitute his own opinion. *See Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001) (reversible error for ALJ not to order consultative exam where such evaluation necessary to make an informed decision); *Nevland v. Apfel* 204 F.3d 853, 858 (8th Cir. 2000) (ALJ's reliance on non-treating, non examining physician opinions does not satisfy his duty to develop the record; ALJ may not draw upon his own inferences from medical reports). An ALJ is not at liberty to "ignore medical evidence or substitute his own views for uncontroverted medical opinion." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999). *See also, McBrayer v. Secretary of Health and Human Svcs.*, 712 F.2d 795, 799 (2nd Cir. 1983) ("While an administrative law judge is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him.") (citations omitted). The ALJ committed reversible error by substituting his own opinion for the opinions of

Plaintiff's's treating, examining and consulting physicians to reach the conclusion that Plaintiff's degenerative disc disease was non-disabling on July 13, 2006 but disabling on July 14, 2006.   For this reason alone, Plaintiff's case must be reversed and remanded for further consideration.

Plaintiff also asserts the Commissioner erred by failing to factor into his disability consideration the Plaintiff's "almost constant double vision" from after the Harada-Ito procedure until the second opthalmalogic surgical procedure on May 31, 2006**.**  This information was not presented until the Appeals Council level.

In cases involving submission of supplemental evidence subsequent to the ALJ's decision, the record may include evidence submitted after the hearing and considered by the Appeals Council. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). "In practice, this requires [the court] to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." *Id.* 20 C.F.R. § 404.970(b) requires the Appeals Council to consider additional evidence submitted only if it is new, material, and "*relates to the period on or before the date of the administrative law judge hearing decision . . .*" The date of the medical examination is not dispositive of whether the evidence is material, but rather whether the information contained in the submitted records  relates to the claimant's condition during the relevant time. *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990).

In this case, the relevant time frame is Plaintiff's claimed date of onset (modified by the res judicata date of January 21, 2005) forward.  Plaintiff's administrative hearing date was April 23, 2008. The ALJ issued his written decision on June 30. 2008.  If the information submitted to the Appeals Council related to the time period between January 21, 2005 and June 30, 2008, therefore, it should have been considered.

One must look further than the date on the medical record to determine relevancy.  It appears that all of the information submitted to the Appeals Council after the April 23, 2008 administrative hearing (AR 375-395), although some bears a date after June 30, 2008 (the date of the written

decision), could be interpreted as related to the time frame before the written decision.[20] On remand, therefore, it should be considered in determining Plaintiff's disability status.

> ### 2. Whether the ALJ's Finding that Plaintiff Was No Longer Disabled as Of October 1, 2007 Is Supported by Substantial Evidence.

Plaintiff asserts the ALJ's finding that he sustained medical improvement related to the ability to work at the substantial gainful activity level (20 C.F.R. 404.1594(3) is not supported by substantial evidence.

The ALJ found Plaintiff disabled from July 14, 2006 through September 30, 2007, as a result of Plaintiff's low back pain and fusion surgery at the L4-5 level. He found, however, pursuant to the

---

[20]The evidence identified as submitted to the Appeals Council is:
**1)** Dr. Morgan's May 15, 2008 evaluation (AR 375-78). This evaluation is clearly within the appropriate time frame.

**2)** Records dated January 15, 2009 through July 10, 2009 from Orthopaedic Consultants (Dr. Alvine). AR 379-88, 390-393. Although the date on these medical records appears to be outside the relevant time frame, they refer to the second surgical fusion of the same area of Plaintiff's low back (L4-5 level) which the ALJ found caused Plaintiff's period of disability from July 2006 through September, 2007. The second surgical procedure was performed on June 23, 2009. AR 391. Dr. Alvine removed the hardware from the first procedure and although the plain films had, as late as April, 2008, previously shown a solid fusion with no hardware failure or loosening (AR 374), a CAT scan in March 2009 indicates "no convincing fusion across the disc space" and "we still have to get a fusion at L4-5" AR 379. The 2009 medical records are relevant to the earlier time frame therefore, because there is a question for Dr. Alvine regarding whether a successful fusion ever resulted from the first surgical procedure in April, 2007.

**3)** Dr. Freeman's September 10, 2009 letter. AR 395. Although the letter was written in September, 2009, the time frame addressed by Dr. Freeman's letter is relevant. Dr. Freeman explained that before Plaintiff's second eye surgery which occurred on May 31, 2006, Plaintiff had "almost constant double vision" which inhibited him from looking into down gaze. AR 395.

**4)** Dr. Brodsky's August 31, 2009 letter AR 394. Again although the letter was written in August 2009, Dr. Brodsky refers to Plaintiff's 2000 injury which resulted in traumatic brain injury and considerable disability for "several years." AR 394.

All of the records which were rejected by the Appeals Council, therefore, should have been considered.

modified five step procedure outlined above, that Plaintiff sustained a medical improvement of his condition as of October 1, 2007, and that the medical improvement is related to Plaintiff's ability to work at the substantial gainful activity level.  AR 23.

The ALJ relied upon  Dr. Alvine' s October 1, 2007 visit to make the finding that medical improvement of Plaintiff's condition related to his ability to work  had occurred as of that date.  The ALJ stated , "Dr. Alvine did not place any work restriction on the claimant at that time, simply noting that claimant could continue to work as he has been doing."  AR 23.

Dr. Alvine's note dated October 1, 2007 is found at AR 372.  It states "He is here for follow-up of his back fusion, i.e. L4-5 microdiskectomy, TLIF and posterior stabilization with sextant screws.  He is five months out.  He is doing reasonably well.  He says his left leg still has not come around like he had hoped, but we know this has been a chronic issue.  He still has some back pain but manageable."  In the "Recommendations" section of Dr. Alvine's record, Dr. Alvine stated "[a]t this point, we are going to have him continue to work three hours a day, 25 hours a week.  We will also write for him to have a cushioned mat to stand on at work, which I think will help.  I can follow him on a PRN basis.  We decided to see him back one year from surgery for x-rays, sooner if there are any problems or concerns."  AR 372.

Dr. Alvine, therefore, did not indicate Plaintiff could return to work full time.  Nor did the ALJ contact Dr. Alvine (or any physician)[21] to inquire whether Plaintiff was capable of working full time at any level of exertion.  This, in combination with the ambiguity regarding the actual success or non-success of the first fusion surgery, leaves the ALJ's determination that Plaintiff became capable of full time light duty work as of October 1, 2007 without the support of substantial evidence in the record.

---

[21]The most recent opinion from a non-examining, non-treating state agency physician is the one sentence opinion of Dr. Kevin Whittle found at AR 335.  It was rendered on December 8, 2006, before Plaintiff's first surgical procedure.

3.      Whether The ALJ Erred by Failing to Make Express Credibility Findings
        Before Formulating Plaintiff's Post October 1, 2007 RFC

Plaintiff asserts the ALJ failed to properly consider the *Polaski*[22] factors when evaluating
Plaintiff's credibility regarding pain complaints/symptoms for purposes of formulating his residual
functional capacity. The formulation of the RFC has been described as "probably the most important
issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogated
on other grounds in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). Additionally, "[i]t is the
claimant's burden, not the Social Security Commissioner's burden, to prove the Claimant's RFC."
*Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citations omitted). The procedure to
determine a claimant's RFC was summarized as follows in *Pearsall*:

> It is the ALJ's responsibility to determine a claimant's RFC based on all relevant
> evidence, including medical records, observations of treating physicians and others,
> and claimant's own descriptions of his limitations. Before determining a claimant's
> RFC, the ALJ first must evaluate the claimant's credibility. In evaluating subjective
> complaints, the ALJ must consider, in addition to objective medical evidence, any
> evidence relating to: a claimant's daily activities; duration, frequency and intensity of
> pain; dosage and effectiveness of medication; precipitating and aggravating factors;
> and functional restrictions. Subjective complaints may be discounted if there are
> inconsistencies in the evidence as a whole. A lack of work history may indicate a lack
> of motivation to work rather than a lack of ability. The credibility of a claimant's
> subjective testimony is primarily for the ALJ to decide, not the courts.

*Id.* at 1217-1218 (citations omitted).

This analysis must begin with the principle that the court must "defer to the ALJ's
determinations regarding the credibility of testimony, so long as they are supported by good reasons
and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "When an ALJ
reviews a claimant's subjective allegations of pain and determines whether the claimant and his
testimony are credible, the ALJ must examine the factors listed in *Polaski* and apply those factors to
the individual." *Reynolds v. Chater*, 82 F.3d 254, 258 (8th Cir. 1996). *See also Polaski v. Heckler*,
739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[23] The ALJ is not required to
"explicitly discuss *each Polaski* factor in a methodical fashion" but rather it is sufficient if he

---

[22]*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

[23]This regulation codifies the *Polaski* factors.

"acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; (9) claimant's complaints to treating physicians. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001); *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

Plaintiff made the same complaints throughout the entire relevant time frame (January 21, 2005 through the date of the ALJ's decision). The ALJ, however, found Plaintiff to be not credible from January 21, 2005 through July 14, 2006,[24] credible from July 15, 2006 through September 30, 2007,[25] and not credible again from October 1, 2007 forward.[26]

The ALJ did not mention *Polaski* in his decision, but he did cite 20 C.F.R. § 404.1529(c)(3) and SSR 96-4p and 96-7p.[27] AR 20.   That, however, is the extent of the ALJ's credibility analysis.

---

[24]The ALJ stated "testimony of the claimant as to the severity of low back pain with resultant functional limitations was exaggerated, not fully credible, and not substantially supported by medical evidence and opinion I record from January 21, 2205 through July 13, 2006."

[25]The ALJ found "from July 14, 2006 through September 30, 2007, the claimant's statements concerning the limiting effects of his symptoms are generally credible and supported by medical evidence and opinion in record." AR 21.

[26] "Testimony of the Claimant as to the severity of low back pain with resultant functional limitations he experienced since October 1, 2007, through the date of this decision, was exaggerated, not fully credible, and not substantially supported by medical evidence and opinion in record." AR 24.

[27]SSR 96-7p speaks directly to evaluating a claimant's credibility.  The SSR emphasizes that it is insufficient for an evaluator to make a single, conclusory statement that a claimant is not credible, or to merely recite the factors before making such a statement.

33

Both the regulation and the SSR require specific references to record evidence (other than the lack of objective medical findings) which support the credibility determination. The ALJ's cursory reference to the applicable regulation and SSR 96-7p followed by a conclusory statement that Plaintiff is not credible for the time period beginning on October 1, 2007 is wholly insufficient to constitute substantial evidence upon which this Court may rely to uphold a credibility finding. The ALJ's credibility finding, and necessarily his RFC formulation, therefore, are not supported by substantial evidence.

## CONCLUSION and RECOMMENDATION

It is respectfully recommended that the the Commissioner's denial of benefits be REVERSED and REMANDED for reconsideration.

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. The Plaintiff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. *Id., Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. *See also Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this 2↓ day of August, 2011.

BY THE COURT:

*John Simko*

John E. Simko
United States Magistrate Judge

35